Martin v. State.

# CRIMINAL LAW.

[Clinton County Circuit Court, November Term, 1898.]

Smith, Swing and Giffen, JJ.

### JOHN C. MARTIN v. THE STATE OF OHIO.

1. TESTIMONY MAY BE HEARD ON APPLICATION OF ACCUSED FOR ADMISSION TO BAIL BUT REFUSAL TO HEAR NO GROUND FOR REVERSAL UNLESS PREJUDICIAL.

Although there is no statute of the state providing for a hearing, upon the application of the accused, after an indictment for murder in the first degree to be admitted to bail, the court, where there is reason to justify the action, may hear testimony, and allow him to furnish bail. But where the trial was set for an early day, and no special circumstances were set up affording a good ground for hearing the application it should be denied. But if the application in this case should have been heard, it should not avail to reverse the judgment, as the rights of defendant were not prejudiced by the ruling of the trial court.

2. MOTIVES OF PERSON APPOINTED TO ASSIST PROSECUTION, NOT A GROUND FOR REVERSAL, WHEN HIS CONDUCT NOT SHOWN TO BE PREJUCIAL.

While a person appointed to assist in the prosecution of an accused person on behalf of the public, should be actuated by a desire to properly represent the public interest, and not by merely private and personal motives, or desire to convict to gratify his own evil feeling, or to subserve his private pecuniary interest, there being no provision of statute as to any special qualification or disqualification of the person appointed, the uniform practice and usage has entrusted to the trial court a large discretion in such matters. But it not being shown or claimed that the attorneys for the state conducted trial otherwise than in the fairest and most proper manner, if there was error in the appointment it was not prejudicial to the defendant, and is considered legal.

3. PRELIMINARY PROOF OF CIRCUMSTANCES UNDER WHICH ALLEGED DYING DECLARATIONS WERE MADE.

In a case of alleged homicide, the question before what purports to be dying declarations of the declarant shall go to the jury as evidence, it must be determined by the court by preliminary evidence, that they were made by the declarant *in articulo mortis*, or *in extremis*, or, at the least, in imminent danger of death, and were also made by the declarant under a sense of speedy or impending death which excluded from his mind all hope or expectation of recovery. And it is the right of the court to hear this evidence in the absence of the jury, and his duty to do so on the application of the defendant.

4. PRELIMINARY PROOFS SHOULD BE RESUBMITTED TO THE JURY.

Where the court, upon such preliminary hearing, in the absence of the jury holds · that the declarations are admissible, the same or similar evidence must be submitted to the court and jury, to show that such declarations were in fact made by the declarant, under such circumstances and in such state of mind as rendered them competent as dying declarations.

5. DECISION OF THE COURT TO ADMIT THE DECLARATIONS NOT CONCLUSIVE OF WEIGHT OR CREDIT TO BE GIVEN THEM.

Upon the submission of evidence as to the jury upon the alleged dying declarations, it is the right of the defendant to cross examine the witnesses, to show if he can, that there were no such dying declarations made, or if they were that they were not in law such declaration, or for any reason, they are not credible or entitle to any weight, and the defendant may offer evidence upon these points in his defense, and it is the promise of the jury to decide these questions.

6. PREJUDICIAL ERROR NOT TO PRODUCE THE EVIDENCE OF THE WITNESSES TO THE JURY.

Where, as in the case at bar, a person seeks to introduce in evidence as a dying declaration, a written statement signed by the person whose death is being investigated, and facts are claimed to have been proved, in the preliminary hearing before the court, by witnesses not heard by the jury, and on this testimony the paper is read to the jury, and thus substantive evidence is

allowed to go to the jury not established or sought to be, by any witness examined before therein, ·there is error prejudicial to the defendant for which the judgment should be set aside.

7. ADMISSIBILITY OF A DECLARATION MADE A LONG TIME AFTER DECEASED WAS HURT.

The terms laid down by the Supreme Court in Robbins v. State, 8 O. S., 131, that to make the declaration of an injured person competent evidence as a dying declaration against the accused. It must have been made while the declarant was in *articulo mortis*, or, as in State v. Kindle, 47 O. S., 358, in *extremis*, imply that the person must be about to die, and that this is as necessary to their competency as that the declarant believes that he is. But while·it cannot be claimed that the death of the person must occur immediately, or within a short time to make his dying declaration admissible in evidence, yet where a person lives a.long time after receiving a wound, three months as in this case, query, whether a declaration made by him soon after he was hurt, was in fact made *in extremis* or in *articulo mortis*.

8. EVIDENCE OF ACTS OF MASONIC LODGE AS TO CHARGES AGAINST ACCUSED, RELATIVE TO RELATIONS WITH WIFE OF PERSON KILLED.

Where written charges had been filed in a Masonic lodge of which accused was a member, previous to the shooting, by a brother of the deceased, charging him with unmasonic conduct towards a brother mason, the deceased, by seducing and alienating the affection of his wife, the fact that he was served with a summons and a copy of the charges by an officer of the lodge, and received them on the day previous to the shooting are relevant, as tending, to show the motive of the accused, or the state of mind existing in him, a few hours after this time, when he became advised of the proceeding. But testimony of what was done by the lodge, there being no evidence that defendant had any knowledge of them, should have been excluded.

9. RECORD NEED NOT SHOW THAT ACCUSED WAS PRESENT AT VIEW OF PREMISES.

When, in the trial of a case, a view of the locality as to which evidence is to be offered is ordered. the court should be careful that the right of the defendant to be present at the same should be protected and guarded, and it is best to have the record show that he was present, or had the privilege of being present. But it is not necessary that it should so appear on the record, and it will not be conclusively presumed that defendant was prevented from being present at the view, because he was in the custody of the sheriff, when the record does not show that he was present, it being stated by counsel for state that he was present and not controverted.

10. HEARING OF INCOMPETENT PROOF, WITHDRAWN FROM· JURY, CAUSED BY INSTRUCTIONS OF COURT TO DISREGARD IT.

Unless it is manifest that hearing the evidence is prejudicial to the rights of the defendant, if incompetent proof is admitted under claim of council for the state that other evidence will be introduced which will make it competent, and this is not done, if the court withdraws such evidence from the jury, and clearly and distinctly instructs them that they should not consider it at all, is caused by the action of the court.

11. ADMISSIBILITY OF EVIDENCE OF REPUTATION TO REBUT EVIDENCE OF CRIMINAL RELATIONS WITH WIFE OF PERSON KILLED.

Where accused is charged with murder in the first degree, evidence tending to show improper and criminal relation to have existed for some time previous to the shooting, between him and the wife of the person killed, is competent for the purpose of throwing light upon the motives of the defendant, and where such testimony is received, it is error for the court to refuse to allow him to offer testimony tending to prove that for years the character of the woman was above reproach, he having been allowed to offer his evidence in direct denial of such alleged criminal intimacy.

12. IMPOSING UPON DEFENDANT THE BURDEN OF PROVING THAT THE GROUNDS OF SELF DEFENSE MUST CAUSE A MAN OF ORDINARY COURAGE TO BELIEVE IN THEIR EXISTENCE IS ERROR.

Where accused has attempted to justify the homicide on the ground of self defense, it is error for the court to charge the jury that accused must have reasonable grounds for the belief that is necessary to take the life of his assailant to protect his own life or prevent great personal harm to himself, and add that they were to be "such grounds as would cause a man of ordinary courage to so believe." The jury are to look at the case from the stand point of the defendant himself, and determine under the circumstances of

stress of excitement surrounding him, whether, without fault or carelessness, on his part, he did honestly believe that he was in imminent danger of losing his life, or of receiving grievous personal injury, and to prevent this it was necessary to take the life of his assailant.

13. VERDICT NOT TO BE SET ASIDE AS AGAINST WEIGHT OF EVIDENCE UNLESS MANIFESTLY WRONG.

Where there was evidence on the part of the state which, if believed by jury, would probably have warranted them in finding as they did, notwithstanding there was evidence by the defendant which, if true, would tend very strongly to show that he was properly defending himself against a violent attack made upon him, by the man who for weeks before had been threatening to kill him, and that he did honestly believe and had reasonable ground to believe that what he did was for the preservation of his own life, the weight and credibility of all this evidence is a question for the jury, and the verdict not being manifestly wrong, will not be set aside.

ERROR to the Court of Common Pleas of Clinton county.

SMITH, J.

The plaintiff in error having been indicted by the grand jury of Clinton county, on a charge of murder in the first degree for the killing of George McMillan, after a trial lasting two months, was found guilty of the crime of manslaughter, and was sentenced to be imprisoned for two years in the penitentiary, the jury having recommended him to the clemency of the court. Within the proper time after the rendition of the verdict, a motion for a new trial was filed in behalf of the defendant, assigning many reasons therefor. Some of these were for alleged errors in rulings made at the trial by the presiding judge, and that the verdict was manifestly against the weight of the evidence. This motion was overruled by the court, and the defendant excepted, and in due time bills of exception were allowed and signed by the trial court, purporting to contain all of the evidence offered at the trial, with the rulings of the court as to the admission or exclusion of evidence over the objection of defendant's counsel; the special charges given by the court to the jury before the argument of the case, at the request of the counsel for the state, against the exception of defendant's counsel, and the special charges asked by defendant to be given to the jury before the argument, which were refused, and the exceptions taken to the same; and the general charge as given by the court to the jury, and the exceptions taken thereto by defendant's counsel. They also contain the action of the court on the application to admit defendant to bail after his indictment and before his trial, and on the application of the prosecuting attorney for the appointment of two members of the bar to assist the prosecuting attorney in the trial of the case, with the exceptions taken by the defendant to the action of the court on those matters. The result is that we have before us for consideration and review those bills of exceptions, containing nearly four thousand pages of manuscript, or typewriting, and presenting a very large number of questions for the consideration of the court, for all of these questions are raised by the petition in error, which is filed in the case. It would be almost impossible in any reasonable time to discuss all of the questions thus raised, and we will only refer to those on which counsel seem to rely and which, it seems to us, are those only which require examination at our hands, and we will state our conclusions as to them as briefly as we can, considering the important questions involved.

The first question presented, in the order of time is, whether there was error in the action of the court of common pleas on the application of the defendant to be admitted to bail, after the return of the indict-

ment against him and after the assignment of the case for trial thereon; and if so, whether it is a ground for the reversal of the judgment against him.

The facts in the case, briefly stated, are these: On the eighteenth day of January, 1898, the indictment against the defendant charging him with murder in the first degree was returned by the grand jury, and having been arrested by the sheriff on a warrant issued upon the indictment, he was committed to the jail of the county. On the twentieth day of January, 1898, the defendant being arraigned in open court entered a plea of not guilty to the indictment. On the same day the defendant filed a written motion, asking for an inquiry and hearing of the charge against him, and that he might be admitted to bail, assigning various reasons therefor, among others that he was not guilty of any offense charged in the indictment; that the proof of his guilt was not evident, nor the presumption thereof great; that on the ninth of October, 1897, while engaged about his own concerns, he was unlawfully assaulted by George McMillan, and to save his own life he was compelled to shoot him, and that McMillan languished until January 15, 1898, when he died; that he, the defendant, was arrested on a charge of maliciously shooting McMillan on October 9th, and gave bail in the sum of $5,000.00; that the jail in which he was confined is an unhealthy one, and he fears that his health will be seriously impaired by his confinement therein; that it will be necessary for him to take the depositions of witnesses in Illinois, Dakota, and Colorado on this motion, and he asks the court to fix a day for hearing the motion and that he may be admitted to bail.

Thereupon, on January 22d, Judge Clark was assigned to hear the case, and on January 24th the prosecuting attorney moved the court to assign the case for trial, and to dismiss the application for bail. On January 26th, the court sustained the motion of the prosecuting attorney to assign the case for trial and to dismiss the application of defendant to be admitted to bail. To this the defendant excepted, and a bill of exceptions was allowed showing the refusal of the court to hear evidence that was offered tending to show that the allegations of defendant's application were true. And the case was then assigned for trial February 23, 1898, and a venire for a jury issued for that day. Was this action of the court erroneous?

The constitution of the state, art. 1, sec. 9, provides that:

"All persons shall be bailable by sufficient surety, except to capital offenses, where the proof is evident, or the presumption great."

So far as we are advised, there is no statute of the state provided for a hearing of this kind after an indictment for murder in the first degree has been returned against a defendant; but we have no doubt but that the court, in a case where there are reasons to justify the action, may hear testimony in a case of that kind, and if satisfied that the defendant ought to be admitted to bail, to allow him to furnish it. But we are of the opinion that the holding of the Supreme Court in the case of Kendall v. Tarbell, 24 Ohio St., 196, justified the action of the trial court in this case. It is there held, that during the term at which an indictment charging a capital offense was set for trial, application was made by the accused for the court to hear testimony to show that the offense was in fact bailable. Held, that the application was properly refused. In the decision of Judge White, who spoke for the court, it is said:

"The indictment raises the presumption required by the constitution to justify the refusal of bail. * * * There were no special cir-

Martin v. State.

cumstances relied on as grounds upon which the court was asked to entertain the motion. It seems to have been regarded as the right of the party to have the testimony heard. We think otherwise."

So here, the case was set for trial at an early day. No special circumstances were set up which would afford a good ground for hearing the application. It is true he alleges that he was justified in shooting McMillan ; that the jail was unhealthy, and that he had to take the depositions of witnesses to be read on the hearing of the motion, not at the trial itself. But here the case was assigned for trial at an early day. We think it would not do, to allow the defendant to postpone the trial by merely filing his application. If so, he could defer it till a day or two before the day assigned for the trial, and thus postpone it indefinitely. In addition to this, if we were satisfied that the ruling of the court was erroneous, it is very questionable whether that would avail to cause the reversal of the judgment in this case—clearly no prejudice to the rights of the defendant is shown in this ruling, which would require us to do so.

The next question which arises, is whether the trial court erred in appointing Mr. Savage and Mr. Sloan, or either of them, to assist the prosecuting attorney in the trial of this case in the court of common pleas.

On the twenty-fourth of January, 1898, Mr. Hartman, the prosecuting attorney, represented to the court in writing that the defendant was charged with murder in the first degree ; that it would probably require several weeks to try it; that many intricate and difficult questions were likely to arise, involving more labor than any one attorney can properly perform without assistance; that five attorneys (naming them) already appear as counsel for the defendant, and that he believes that the public interest requires the appointment of an attorney to assist him in the trial of the cause.

Thereupon, on the same day, the defendant filed two affidavits made by himself in relation to the appointment asked for. In the first he avers that he is informed and believes that Mr. McMillan, whom he is charged with shooting, made several dying declarations implicating the defendant, which were reduced to writing by W. W. Savage, whom the prosecuting attorney asked to be appointed to assist him in the prosecution of the case, and that he, Savage, is an important and material witness in the case. And in the other he avers, that on May 27, 1897, Mrs. Boyd died having executed a will which was duly admitted to probate in Clinton county, of which will the defendant was the executor and one of the devisees under the same, and that in 1897 the firm of Mills, Clevenger & Huls, attorneys, of Wilmington, and the firm of Smith, Savage & Thorpe, attorneys of the same place, all confederated together to wrong and injure the defendant, by causing to be printed a large number of circular letters, containing false, wicked and malicious libels against the defendant, and sent them to divers persons, (a copy of the letter sent to some of the heirs of Mrs. Boyd, is set out), purporting to state the manner in which Martin, who it says is no relative of Mrs. Boyd, had wrongfully taken advantage of her weak mental condition and induced her to make the will in his favor, giving him all of her estate of the value of $15,000.00 or $16,000.00, with the exception of $1,300.00, in money bequests, and a life estate in some town property. The writers, Mills, Clevenger & Huls, propose to contest the will and

carry the suit through to a final adjudication without any professional charge, if unsuccessful; if successful, they ask forty per cent. of the boy's share of the estate recovered. For this they say they "will associate with themselves, Messrs. Smith, Savage & Thorpe, who will aid in our contest". In other statements this letter characterizes Mr. Martin's conduct in very strong language. The defendant further avers that Mr. Savage of the firm of Smith, Savage & Thorpe, is the Mr. Savage whose appointment as assistant to the prosecuting attorney is asked. He also avers in his affidavit, that the individual members of the said law firm, designing and intending to injure the defendant, did make a contract with the heirs of S. S. Boyd substantially on the terms stated; that they filed a petition in the common pleas court (a copy of which is given), to set aside said will; that the said two firms appear as counsel for the plaintiffs and other heirs. That said firms and said Savage, have attempted to mould public opinion against the defendant. That he, the defendant, is financially interested in maintaining said will, and will be a material witness on the trial of said case and of this suit, and that said Savage had a financial interest in the setting aside of said will, and is personally and professionally interested in the conviction of the defendant, to aid and contribute to the success of said will contest. That he is, therefore, an unfit and unsuitable person to be appointed to assist the prosecuting attorney, and that neither the public interest or the due administration of justice requires it.

At the hearing of this matter the defendant offered these affidavits in evidence, and offered to prove the truth of the allegations therein contained, by other witnesses called for that purpose; but, "thereupon, the state conceded the facts set forth in said affidavit 'A', (which was the second affidavit of the defendant above referred to), to be true, and the court then declined to hear any other evidence, and appointed Mr. Savage to assist the prosecuting attorney in the trial of said case, to which action the defendant excepted.

It is unfortunate, we think, in view of the allegations of fact made in said affidavit, that the truth of them was conceded, as was done by the prosecuting attorney acting for the state, if they were untrue; or if they were true, that the appointment of Mr. Savage was made, notwithstanding their truth. It would seem that the person appointed to assist in the prosecution of an accused person on behalf of the public should be actuated by a desire properly to represent the public interest, and should not be actuated by merely private and personal motives, or the desire to convict a defendant to gratify his own evil feeling, or to subserve his private pecuniary interests. It is but just to Mr. Savage to say, that in argument to this court he disclaims any such motives, and denies many of the allegations of the affidavit. But, however this may be, we know of no statute or law or rule of practice which was violated by the court in making this appointment; and there is nothing anywhere in the record, nor is there any claim made in the argument, that so far as the attorneys representing the state were concerned, there was any failure to conduct the prosecution in the fairest and most proper manner. If there was any error in what was done, no prejudice to the defendant is shown, even if by the appointment of Mr. Savage under the circumstances, and of Mr. Sloan as an additional assistant, (he to receive no compensation from the county for his services, and it is probable therefore, that he was to be compensated by private parties), the state did have the services of able and astute counsel to assist in such prosecution

Martin v. State.

This was what it was entitled to have, in view of the array of able counsel appearing for the defendant. The law expressly gives to the court the power to appoint an attorney, (and we think more than one if need be), to assist the prosecuting attorney in the conduct of the case, if it is of the opinion that the public interest requires that it be done. There is no provision in the statute, as to any special qualification or disqualification of the person appointed, and so far as we are aware, the uniform practice and usage of our courts, (which in some things makes the law in regard thereto), has intrusted to the court called upon to act a large discretion in matters of this kind. In the absence then, of any stated requirement, we would be disposed to hold that the action of the court in this matter was legal, not prejudicial, to this defendant.

It is strenuously urged by the counsel for the defendant below, that the trial court erred in allowing a paper writing purporting to contain alleged dying declarations of George McMillan, to go in evidence to the jury on the trial of the case. The following is a substantial statement of what took place in regard to this matter:

At a certain stage in the trial, one of the counsel for the state said to the court, that the next evidence they desired to submit was to be addressed to the court, and was not to be presented to the jury until the court heard preliminary evidence. There being no objection to this on the part of the defendant, the court directed the jury to retire from the court room, which it did, in the charge of the bailiff. The court then heard the evidence of Mr. Savage, and of Mr. Hartman, in relation to what was claimed to be the dying declarations of McMillan, made by him, one on the ninth day of October, 1897, a few hours after he was shot, which it was testified to was reduced to writing by Mr. Savage and signed by Mr. McMillan, by his "X" mark, and the other reduced to writing by Mr. Savage, October 11, 1897, and signed by McMillan in the same way, and both of which appeared to have been attested by other witnesses than Savage or Hartman, neither of which witnesses was examined as to the execution of the same. Those witnesses purported to give McMillan's version of the shooting, and it was stated in the first one, that he believed that he was going to die, and that he made the statement in that belief. The testimony of Messrs. Savage and Hartman, who were fully examined and cross-examined as to the execution of those papers and the mode and manner of the execution thereof, and of the physical and mental condition of McMillan at the time, and as to all that he said as to his belief as to his speedy and certain death, covers about seventy pages of type-written foolscap paper. The state then declined to offer further evidence to the court on this point, and submitted the question. Counsel for defendant then suggested that all of the witnesses present at the execution of such papers be called. The court declined to order the state to do this, and inquired of counsel for the defendant if they desired to submit any testimony, and one of those replied that at present they did not, as to the competency of said dying declaration, but would object to them going to the jury on the ground that the evidence did not warrant the court in holding it to be competent. Thereupon the court said, that there remained nothing to do but for the court to pass upon the competency of this paper, and then stated that the declaration was admitted as evidence to go to the jury.

Thereupon, before the jury came into the box, the counsel for the defendant "objected to the introduction of said paper, or so-called dying declaration, until after the jury should have come out, and the state

again makes a showing in the presence of the jury, prima facie, at least, or at least to such extent as the court might deem necessary to authorize the admission of the paper.

The jury were then brought into court by order of the judge, and Mr. Sloan, of counsel for the state, was about to read the paper to the jury:

"When counsel for the defendant again objected until the state, in the presence of the jury, in open court, while the same is in session, shall first introduce, in the presence and hearing of the jury, testimony in its behalf tending to show the competency of the alleged dying declarations."

This objection the court overruled, and the exception of the defendant was noted, and thereupon Mr. Sloan, one of the counsel for the state, said to the jury "I now read to you what purports to be the dying declaration of the deceased, George McMillan, as admitted to you, as stated by the court"; and the paper was then read by him to the jury.

Thereupon Major Blackburn, one of the counsel for the defendant, moved the court to exclude this declaration from the jury on the ground, substantially, that there was no sufficient evidence as to its competency given to the court, and no showing touching its competency in the presence of the court and the jury. This motion was then overruled by the court, and the defendant excepted.

The question whether this paper, under all the circumstances of the case, was properly allowed to be given as evidence to the jury, is an important one, vitally affecting the rights of the defendant in this case, and involving the correct rules of practice and proceedure in cases of this character. It appears to us, that there is some confusion in the authorities, and it may be said that in some of the decisions as to dying declarations, and what evidence in regard to them is to the jury, and for what purpose that evidence is to be considered by the jury, language is used that seems to conflict with that used in other cases, and thus to create some confusion as to what is the true rule in regard to the question raised in this particular case.

There are some principles of law, however, in relation to dying declarations and their presentation to the jury, which seem to us entirely clear and well settled. In the first place, it is universally admitted, we believe, that the question whether what purports to be dying declarations shall or shall not be submitted as evidence to the jury, on the trial of a person charged with the killing of the declarant, must in the first instance be determined by the court, and can only be admitted when it is made to appear to the trial judge or judges by preliminary evidence offered to him or them, that they were made by the declarant while he was *in articulo mortis*, or *in extremis*, or at the least, in imminent danger of death, and were also made by the declarant under a sense of speedy or impending death, which excluded from his mind all hope or expectation of recovery. And we think, it is also the undoubted right of the court to hear this preliminary evidence in the absence of the jury, and perhaps he should do so on the application of the defendant, if the evidence is offered by the state, so that the minds of the jury should not be prejudiced by hearing incriminating statements of the declarant against the defendant, if on such hearing the court should hold such declarations to be not admissible. As we understand it, this rule of practice is for the protection of the defendant.

But, the question of difficulty and dispute in this case is this: suppose the court in this preliminary hearing, in the absence of the jury, holds that the declarations are admissible. What then? Must the same or similar evidence be now submitted to the court and jury, showing, or tending to show that such declarations were in fact made by the declarant, under such circumstances and in such state of mind as rendered them competent and admissible as dying declarations? If the declarations were oral, and were not reduced to writing and signed by the party making them, it would seem essential that the course suggested must be adopted, for how else could the jury be advised as to what the declarations in fact were, to whom made, and under what circumstances? And when the state offers any evidence to the jury on those points, it is entirely competent, if not necessary, for it to go over the whole evidence heard by the court on the preliminary examination, or other additional evidence on these points, and it would be the clear right of the defendant to cross-examine these witnesses on those matters, and to show if he could, that there were no such dying declarations made, or if there were, that they were made under such circumstances as showed that they were not in law dying declarations, or for any reason that they were not credible or entitled to any weight. And the defendant in such case would not be limited to the cross-examination of the witnesses offered by the state on these points, but when he came to his defense, might call any witness to show the same state of fact. And in any such case we have no question, but that it is within the legitimate province of the jury to decide upon all of the evidence offered, whether the alleged dying declarations were in fact made; or if they were, whether they were made under such circumstances as made them dying declarations in the eye of the law, and to decide all questions as to their weight, and the credit to be given to them. It is true that in such a case the court on the hearing of the preliminary evidence has held that they might go to the jury—that is, that on the evidence submitted to him, they were admissible. But his decision is not conclusive of the question; other evidence may have been submitted to the jury which completely disproved it, and the jury is the judge as to this, guided by proper instructions from the court.

Is the case essentially different when it is found by the court on the preliminary evidence heard by it in the absence of the jury, that the declarations in question have been reduced to writing and signed by the declarant, and that it was so executed under such circumstances as entitled it to go to the jury as a dying declaration? Is the state then bound to do more than to present the declaration to the jury, or must it be supplemented by other evidence showing the facts connected therewith—as that it was in fact signed by the declarant, who reduced it to writing, and all the circumstances connected therewith as in the case of an oral declaration?

Unquestionably, if the state did not offer any additional evidence tending to show these facts, the defendant when he comes to present his defense to the jury, would be entitled to show, if he could, as in the case of an oral declaration, anything which would destroy the weight and credit of such a declaration. He might offer convincing evidence that no such declaration was ever made—that the one produced was a forgery —that the person never made any such statement, or if he did, that he was not in immediate fear of death. But the question is, if it is the duty of the state to offer evidence in addition to the declaration itself, how is it absolved or released from that duty because the defendant has

the right if he choose to do so, to attack the document as a dying declaration? If other evidence on the part of the state to make the paper competent is needed, it should not have been allowed to go to the jury without such evidence.

It is difficult to see why there should be a different rule in a case where the declaration is an oral one, and where it appears to have been reduced to writing by some one and signed by the declarant. We suppose that it would hardly be claimed by anyone, that if the state in a homicide case sought to introduce oral statements of a declarant claimed to be his dying declarations, and on the preliminary hearing as to their admissibility, in the absence of the jury, the court should hold them to be admissible, that it would be at all allowable or proper for the judge himself to prepare a statement of what the declarations were, as testified before him, or have the stenographer make an exact copy of what the testimony showed that he said, and submit this as evidence to the jury of the dying declarations of the declarant. And yet this seems to us, in substance, what was done in this case—a paper purporting to be signed by McMillan is allowed to be read to the jury as the dying declaration of McMillan. There was not a syllable of evidence produced to the jury that he ever saw it, or even made any such statement, or that, if he did, he was *in extremis* at the time, and had no hope or expectation of recovery. How can the document itself be competent? It is very questionable whether such procedure would not be in violation of that portion of the bill of rights in the constitution of our state which guarantees, that in any trial in any court, the party accused shall be allowed * * * "to meet the witnesses face to face" * * * "and have a speedy public trial by an impartial jury." It is true that the witness who testifies to the dying declaration of a deceased person in a given case, is the witness who confronts the party accused, and if his testimony is heard in the presence of the jury, this constitutional right is not invaded. But in the case at bar, facts are claimed to have been proved, in the preliminary hearing before the court, by witnesses not heard by the jury, and on this testimony substantive evidence is allowed to go to the jury not established, or sought to be, by a single witness examined before the jury. Is the accused person not entitled to confront such witnesses before the jury, the final judges as to all questions of fact involved in the case?

But however this may be, on full consideration of the question as to the competency of this evidence, as given to the jury, we have come to the conclusion that when the state seeks to introduce in evidence as a dying declaration a written statement signed by the person whose death is being investigated, that the correct rule and practice is stated in volume 10, second edition of the Encyclopedia of Am. and Eng. Law, pages 386-7, thus:

"In weighing dying declarations, the jury may take into consideration all the circumstances under which the declarations were made, including those which were proved to the court in laying the foundation for their admission." * * * "Thus the jury may, notwithstanding the fact that those questions have already been passed upon by the court, determine whether the declarant was *in extremis*, and fully convinced of the fact when making the declaration" * * * "The same facts which were considered by the court in passing upon the admissibility of the declarations, must of necessity be considered by the jury in deciding upon their credibility. Hence, when the court having examined the

question in the absence of the jury, decides in favor of the admissibility of the declaration, the preliminary proof should then be submitted to the jury to enable them advisably, and from all the lights which the facts and circumstances afford, to determine upon the credibility and force of the evidence."

These several citations seem to be abundantly supported by adjudications of reputable courts in this country and England, referred to therein, and few, if any, to the contrary are cited; and the rule is so reasonable and proper as in our judgment to require its observance in all cases, whether of oral or written declarations. We are, therefore, of the opinion that the court erred to the prejudice of the defendant in allowing this declaration to go to the jury under the circumstances disclosed.

There is another question in connection with this alleged dying declaration, and its admission in evidence which was not adverted to by counsel in their argument of the case to us, and which owing, to the conclusions we have reached on other grounds, it is not necessary that we should pass upon, but which nevertheless presents an interesting question. It is this: The first of the two declarations was made October 9, 1897; the second on October 11, two days later. McMillan died January 15, 1898, more than three months after he was shot by defendant. As has been already stated, a declaration by the person injured, to be competent evidence as a dying declaration against the accused person, must have been made, as stated by the Supreme Court in Robbins v. State, 8 Ohio St., 131, while the declarant was *in articulo mortis*, or, as said in the case of State v. Kindle, 47 Ohio St., 358, when *in extremis*. Both of these terms certainly imply that to make a declaration of a person competent, the declarant must in fact be about to die; that this is as necessary to their competency as, that the declarant believe that he is. It cannot be properly claimed in view of adjudged cases, that death in fact must occur almost immediately, or perhaps within a very short time after the making of the declaration. It has been held that evidence of such declarations is admissible when the declarant lingered in a dying condition for several days, and in one case even twenty-one days. Every case of course must stand on its own facts, and if the declarant lingered even three months, as in this case, this of itself, we suppose, would not render the evidence incompetent. But if the evidence in the case should show that when the declaration was made, death was not imminent, it would seem the evidence ought not to be received.

We are not clearly advised as to what the evidence in this case shows on this point. It was stated by counsel in the argument, and not controverted, that at some stage of his sickness, after he was wounded, he was brought from Wilmington to a hospital in this city for treatment, and afterwards was taken back to Wilmington. But it would seem that when a person lives so long after receiving a wound, that it does become a serious question. Whether a declaration made by him soon after he was hurt, was in fact made when he was *in extremis*, or *in articulo mortis*.

It is claimed that the court erred in admitting a great deal of testimony in regard to what is known as the Masonic charges, over the objection and exception of the defendant. That such evidence was wholly irrelevant and incompetent, and that its admission was prejudicial to the rights of the defendant.

The questions arise in this way : At the trial of the case and as a part of its evidence in chief, the state called Mr. Rannels, and sought to prove by him that he was the secretary of the Masonic body of Wilmington, and that sometime in September, 1897, (which was before the said McMillan was shot by defendant), there was filed with him as secretary of such lodge, written charges against the defendant, Martin, charging him with unmasonic conduct towards a brother mason, George McMillan, in having been guilty of adultery with McMillan's wife, and seducing and alienating the affections of the wife of said McMillan. That it became his duty to notify Martin of that fact by preparing a summons and placing it in the hands of an officer, accompanied with a copy of said charges. That such summons, accompanied by a copy of said charges, which were signed by Robert McMillan, a brother of George, was by him placed in the hands of Mr. Lewis, appointed as the tiler of the lodge, in place of Robert McMillan, the actual tiler, for service on Martin, a date having been fixed by the lodge for the hearing of the charges. That the practice in such cases is, for the officer to make verbal return of the service, and that the date fixed for the trial was October 19th. That the summons was placed in the hands of Lewis for service October 7th. That said charges were not tried on October 19th, for the reason that things had taken place which prevented matters from being pressed, viz., the shooting, and Martin being in prison, and that the reason the summons dated September 4th was not delivered to the tiler for service until October 7th, was that William McMillan, another brother of George, was the master of the lodge, and did not want to preside at the trial, and that the secretary was instructed to advise with the grand master, Barton Smith, of Toledo, to ask him to appoint a person to do so. That as secretary he received notice from the grand master that S. B. Evans of Circleville was to sit in the trial, and that this caused a delay in the time fixed for the trial. All of those several items of evidence were objected to by the defendant, and the objections overruled, and exceptions taken and the witness allowed to testify substantially to all of those matters.

Mr. Lewis then, under like objections, was allowed to testify to some of the same matters, and that the papers referred to were served by him upon Martin, October 8th, by leaving them with him personally. The charges themselves were then read to the jury, and this was excepted to.

The affray between Martin and McMillan, in which the latter was shot, occurred on October 9th, the day after the service of this notice and the copy of the charges on Martin. And though so far as appears, George McMillan was not a party to the proceeding, yet his brothers were, and the deceased was so connected with the transaction, and had such relations to those connected therewith, that we are of the opinion that testimony as to the service of those papers upon Martin, and that he received a copy of those charges, was relevant as tending to throw some light on the motive of Martin, or the state of his mind, in doing what he did a few hours after this time, when he thus became advised of this proceeding. In itself it is of small value, but as we have said, we deem it relevant. But much of the other testimony as to what was done by the lodge, after the presentation of those charges, why the trial was delayed, and other matters of this kind, seems to us wholly irrelevant, and to have had no possible relation to the act of the defendant under investigation, there being no evidence to show that he had any knowledge of them. That the reception of the evidence was probably prejudicial to the defendant seems clear. The jury are notified by this

evidence that charges of a grave nature involving moral turpitude and very base conduct on his part have been preferred against the defendant before a body of highly respectable citizens, which deems them of such character as to require the trial of one of its members to see whether he is guilty as charged, and the jury is informed of various steps taken by the lodge with reference to such trial, and that the charges are still pending against him. All of this we think was incompetent, and should have been excluded.

It is also claimed that the court erred in not providing for the defendant to accompany the jury when they viewed the localities as to which evidence was to be offered, and that, as the defendant was in the custody of the sheriff at all times during the trial, and the record does not show that he was present at the view, it must be conclusively presumed by this court that he was prevented from being there.

The record shows that the view was ordered on the joint application of counsel on both sides, and there was entire agreement as to the points the jury were to visit in charge of the officer, and that counsel should be present. The record does not show that the defendant himself was present, but it is said by counsel for the state that he was, and this is not controverted by any one, and must be true, or counsel so able as those representing the defendant, if in fact he had been deprived of this right, would, in some legal manner, have made the record show that fact. The court in the trial of a case when a view is ordered, of course, should be careful that the right of a defendant to be present at the same, should be guarded and protected, and it would be well to have the record show that he was present or had the privilege of being present. But that it is necessary that it should so appear on the record, or that if it does not, that the judgment rendered should be reversed on this ground, we do not agree to.

The trial court admitted certain evidence as to the estates of Mr. and Mrs. Boyd, under the claim of counsel for the state that certain other evidence would be produced which would make it competent. This was not done, and thereupon the court withdrew such evidence from the jury, and clearly and distinctly instructed the jury that they should not consider it at all. Still it is claimed by counsel for the defendant, that if the evidence was incompetent, as is perhaps conceded, that this action of the court did not cure the error. We think the law of this state is otherwise, unless it be manifest that the hearing of the evidence was prejudicial to the rights of the defendant, which there is no reason to suppose in this case. See 16 Ohio St., 221; 19 Ohio St., 569, 571; 3 C. C., 551.

It is further claimed that the court erred in allowing evidence to be introduced to the jury, tending to show improper and criminal relations to have existed for some time previous to the shooting, between Martin and the wife of McMillan, and that when the defendant came to offer his evidence, the court refused to allow him to offer testimony tending to prove that for years before this, the character and reputation of Mrs. McMillan as a pure and virtuous woman was above reproach, the defendant having been allowed to offer his evidence in direct denial of any such alleged criminal intimacy.

We are of the opinion that the court did not err in admitting the evidence tending to show the relations between Martin and Mrs. McMillan. If the claims of the state were well founded, such proof might be of value in throwing light upon the motives which actuated Martin in

shooting McMillan, and such evidence of motive on his part was admissible in a case where he was charged with murder in the first degree.

On the other hand, where the evidence tending to prove such improper intimacy was perhaps wholly circumstantial, why was it not competent for the defendant to prove in the way sought, that it could not be so, or that the great probability, owing to the character or standing of one of the parties, was that it was improbable that such was the case. As stated in Stephens' Digest of Evidence, chapter II, article 2:

"Evidence may be given in any action of the existence or non-existence of any fact in issue, and any fact relevant to any fact in issue, and of no others."

The motive of the defendant in shooting the deceased was one of the facts in issue in this case, and therefore, if evidence as to the existence or non-existence of that motive was competent and was offered, en any fact, revelant to that fact in issue, was competent. And we ink, evidence as to the general character and reputation of Mrs. McMillan was of that kind. In 129 Mass., 474, it was held:

" That on a trial of an indictment for adultery, evidence of the reputation as to chastity of the woman with whom the defendant is charged to have committed adultery, is competent."

This case, we think, is directly in point, and we hold that the court erred in excluding such evidence.

After the evidence was all introduced, and before argument to the jury, the counsel for the state asked the court to give to the jury seventeen separate special charges in writing, then submitted. To the giving of each and all of which the defendant objected, and thereupon the defendant asked the court to give to the jury forty-eight special charges in writing, then submitted, and the state objected to the giving of each of said special charges, and then argument was had as to said charges, and at the conclusion thereof the court gave to the jury fifteen of the special charges asked on behalf of the state, and to the giving of each of the same the defendant excepted. And the court then gave to the jury thirty-seven of the special charges asked by the defendant, and refused to give eleven thereof, to which refusal as to each, the defendant excepted. All the charges given and refused are set forth in the bill of exceptions. On this the case was argued to the jury, and the court then charged the jury; which was in writing, and a copy of which is set forth in the bill of exceptions, with the many specific exceptions taken thereto by the counsel for the defendant, there being seventy-seven of these exceptions.

Those special charges asked for, and given or refused, and the general charge of the court, with the exceptions thereto, occupy one hundred pages of the bill of exceptions. It is out of the question therefore, that we should undertake to pass in detail on the questions thus raised. We deem it sufficient to briefly consider those which counsel seem to have deemed of importance, or which seem so to us; and we think that very many of the charges given for the state and excepted to, present the same general question, and very many of them which relate to murder in the first or second degree, are not now important, as the jury returned a verdict finding that the defendant was not guilty of either.

One of the questions most earnestly debated by counsel in this case, is raised by the language of several of the special charges given by the court to the jury, and also by the language used by the court in the general charge. And this related to the plea interposed by the defendant

that he had shot McMillan in the proper and justifiable defense of him-self against a violent and felonious attack upon him by said McMillan. It may be that the exact point in controversy may be seen best, by quoting what was said by the court in its general charge to the jury, on one of the phases of the law of self defense, as follows :

"Again, it must appear that the defendant at the time of firing the fatal shot, in good faith, and in the proper and careful exercise of his faculties, believed, and had reasonable ground for believing, that he was in imminent danger of death or great bodily harm from such assault. The mere belief alone, in such danger, is not sufficient to excuse a homicide. He must have arrived at such belief by the careful and reasonable use of his faculties ; and further, he must have had reason-able ground for believing the existence of such danger, *such grounds as would cause a man of ordinary courage to so believe.* You are to deter-mine not only whether he entertained such belief in good faith, but also whether his conclusion was, under all circumstances, a reasonable one for him to arrive at. The reasonableness or unreasonableness of his conclusion is to be judged by placing yourself as nearly as possible in his position at the fatal moment, with such information as he had concerning the disposition of his assailant toward him, and subject to whatever influence the evidence may show was operating upon his mind. In determining whether he had such reasonable grounds, you must take into account the nature of the attack made upon him, the apparent power to prevent the same; the relations existing between himself and deceased, and his own knowledge of his assailant having threatened to take his life and had assaulted him, (if such is the fact), and all the other circumstances of the occasion. If he in good faith believed, upon grounds reasonable under the circumstances that he was in such danger, then he had the right to act as if such danger existed, notwithstanding the fact that he may have been mistaken, and that sub-sequent investigation may show that there was no such danger."

We may say that in our judgment, the foregoing extract from the charge of the court, leaving out of view the line which we have italicised, (and which evidently was interlined in the typewritten charge prepared for the jury and after its preparation), seems to be in entire accord with the decisions of our Supreme Court on this question, and of our own view of the law.

But the controversy which arises on this point is whether the intro-duction into this charge of these words: "Such grounds as would cause a man of ordinary courage to believe," words conveying the same idea, would make the charge erroneous. That is, must a defendant in a case of this kind make it appear, that in the careful and proper use of his faculties he not only honestly believed that it was necessary to take the life of his assailant making a felonious attack upon him, to protect his own life or prevent great personal harm to himself, and have reasonable grounds for such belief, but in addition thereto show, that the grounds of such belief were such as would cause a man of ordinary courage to so believe? This also was substantially the requirement laid down by the court in this case in the special charges given to the jury at the request of the counsel for the state, Nos. 2, 11, 15 and 17.

So far as we can gather from the adjudications of courts there is considerable conflict of opinion as to this point, viz.: that conceding it to be true that a person seeking to justify himself for taking life in the defense of himself against a felonious assault, must show that he honesty

believes that it was necessary for him to do so, and that he had reasonable grounds to so believe, is it the law that if he does so believe, and the circumstances show that taking him as he was, he had good cause to believe it was necessary for him to do as he did, should he go acquit; or is the jury, notwithstanding they are convinced that he honestly believed his act to be necessary, and that to a man in his circumstances his act seemed to be reasonable, that they can properly find that such belief was not reasonable in fact and convict him?

So far as we know or have seen, this exact question has not been passed upon by the Supreme Court of this state. Marts v. The State, 26 Ohio St., 162, is perhaps the leading case on the subject of self-defense, and in that case it is held that:

"Homicide is justifiable on the ground of self-defense, when the slayer, in the careful and proper use of his faculties, *bona fide* believes and has reasonable ground to believe that he is in imminent danger of death or great bodily harm, and that his only means of escape from such danger will be by taking the life of his assailant, although in fact he is mistaken as to the existence or imminence of the danger."

It seems to us that this comes very close to the view entertained by those, who adopt the idea that when the person assailed honestly believes that it is necessary for him to take the life of his assailant to protect his own, and the circumstances are such as to reasonably lead him to so believe, that he should go acquit. For it is expressly stated, that the danger must not necessarily be real, but only apparent; for it is said that he is under such circumstances justified in taking the life of the assailant, though in fact he is mistaken as to the existence or imminence of the danger. It is true that the part of the syllabus quoted is, that to justify the homicided, there must not only be the honest belief of its necessity, but that he must also have reasonable grounds to believe it. And there is good ground for argument that it was the meaning of the court, that the question whether there was reasonable ground for the defendant honestly to believe that, was of necessity to be submitted to and determined by the jury. And this view seems to be strengthened by the decision in the case of Darling v. Williams, 35 Ohio St., 58, where it is held that:.

"Homicide is not excusable on the ground of self-defense, although the slayer believes in good faith that he is in imminent danger of death, or great bodily harm, and that his only means of escape from such danger consists in taking the life of the assailant, unless there are reasonable grounds for such belief."

And in the decision of the case, Judge Boynton uses language which shows that in his view, the party who sets up the plea, is not the sole judge, whether he had reasonable ground to believe that the act of killing was necessary to protect his own life.

This question is discussed ably and at length by Mr. Wharton in his works on Homicide, under the title, "Self-defense," in section 493 and post. In section 493, he says:

"Whether the danger is apparent, is to be determined from the defendant's standpoint. Here no doubt, we arrive at a point where begin marked divergences of judicial sentiment. It is conceded on all sides that it is enough if the danger which the defendant seeks to avert is apparently imminent, irremedial and actual. But apparently as to whom? Here three theories meet us. The first is, that the standpoint is that of the jury. No doubt in a primary sense this is correct. The jury must

judge whether the danger was apparent, but it is absurd to say that it is necessary that the danger must have been such as to be apparent to themselves as they finally deliberate on the case. If this were true, an unloaded pistol would cease to be an apparent danger; for the jury when they come to decide the case know that the pistol was unloaded and know that there was no real danger. However, what the jury have to decide is, not whether the danger was apparent to themselves, but whether it was apparent by some other standard—what is the other standard which the jury are thus to apply?"

After stating the answer given by several courts to this inquiry to be, "that if a reasonable man would have held hat the danger was ·apparent, then the danger will be treated as apparent," and on account of the ambiguity of the authority cited to maintain it, he gives other authorities maintaining the view, "that the danger must be apparent to the defendant, and it is sufficient if it be so," or, as stated in a case decided by Baron Park: " The rule of law founded in justice and reason is, the guilt of the accused must depend upon the circumstances as they appear to him ;" and quite a number of authorities are cited as sustaining this view, and which they seem clearly to do. And the conclusion reached by Mr. Wharton is that, both on principle and authority, the latter view is the correct one.

And Mr. Bishop, in his work on Criminal Law, states the doctrine on this point thus, vol. 1, sec. 305 :

" In self-defense—if in language not uncommon in the cases, one has reasonable cause to believe, the existence of facts which will justify a killing—or in terms more nearly. in accord with the principle upon which the rule is founded, if without fault or carelessness he does believe in it, he is legally guiltless of the homicide; though he mistook the· facts, and so the life of an innocent person is unfortunately extinguished. In other words, and with reference to the right of self-defense and the not quite harmonious authorities, it is the doctrine of reason, and sufficiently sustained in adjudication, that notwithstanding some decisions, apparently adverse, wherever a man undertakes self-defense, he is justified in acting on the facts as they appear to him. If without fault or carelessness, he is misled concerning them, and defends himself correctly according to what he thus supposes facts to be, the law will not punish him, though they are in truth otherwise, and he really has no occasion for the extreme measure."

Our own opinions on this question are fully in accord with those quotations from the works of those two authors. We esteem it to be the correct, as well as the only safe doctrine. The jury, of course, is to decide from all the evidence, whether the defendant honestly believed in the existence of the danger to himself, and the necessity of taking life to protect his own. But they are to look at the case from the standpoint of the defendant himself, and determine under the cicumstances surrounding him, of stress or excitement it may be, whether, without fault or carelessness on his part, he did honestly believe that he was in imminent danger of losing his life, or receiving other grievous personal injury, and to prevent this it was necessary to take the life of his assailant. If they find such to be the case, the law will not punish him. The charges of the court then, that to make out a case of self-defense, it must appear to the jury that the defendant not only in the proper and careful exercise of his faculties believed in the existence of such danger, and such necessity, but in addition that he must have had such grounds as would cause a

man of "ordinary courage" or of "ordinary firmness," or "an ordinarily courageous man" to so believe, we think were erroneous.   This is imposing upon the defendant in a case of this kind a burden, for which we see no warrant in any decision in this state, and is opposed, as we think, to the great weight of authority.   How is the defendant in his stress or excitement in which he probably would be, to know or judge how a man of ordinary courage would act if in his place, or how is the jury to know this ?   We therefore are of the opinion that the trial court erred in those charges before numbered, and in the use of the language referred to in the  general charge, and in refusing to give the special instructions asked by the defendant on this point, if in other respects they were right.   But we have not deemed it necessary to be more explicit as to this, or to go into a critical examination of the correctness of the many other charges given on behalf of the state and excepted to, or of those asked by the defendant and refused.   Several of these last seem to us to be correct, but were substantially  given in the general charge.

Finally it is claimed that the verdict of the jury was manifestly against the weight of the evidence, and that the trial court erred in refusing to grant a new trial asked for on this ground.   It is sufficient for us to say on this point, that in our judgment there was evidence on the part of the state, which, if believed by the jury, would probaby have warranted them in finding as they did.   Certainly there was evidence on the other side, which, if true, would tend very strongly to show that the defendant was only properly defending himself against the violent assault made upon him by a man who for weeks before had been threatening to kill him, and that the defendant did honestly believe, and had reasonable ground to believe, that what he did was for the preservation of his own life.   But the weight and credibility of all of this evidence was for the jury to pass upon, and unless this verdict was clearly and manifestly wrong, we ought not under the well settled rules of the law to interfere with it.

But for the reasons hereinbefore specially stated, the judgment will be reversed and a new trial awarded.

*C. H. Blackburn, Hayes & Swain, E. J. West,* for plaintiff in error.

*W. H. Hartman, W. W. Savage,* and *Clive Sloan,* for defendant in error.